Our next case is Carnell Construction v. Danville Redevelopment and Housing Authority. Ms. Harmon, whenever you're ready, we'll be glad to hear from you. Thank you, Your Honor. May it please the Court. I'm Rhonda Harmon, and I represent Carnell Construction Corporation. The trial court reversibly erred in three critical ways in this case. First, the court erred by ruling on summary judgment that Blaine Square had no involvement in the construction of this project and had no agents to do so, and ruled as a matter of law that it could not be held liable under Section 1981 or Title VI, despite substantial evidence to the contrary that was before that court. Second, the court erred in the impeachment of Michael Skills by, among other things, allowing him to be impeached with a toxic statement he had neither made nor adopted. And third, the court erred in a number of respects with respect to damages. Among other things, he prohibited Carnell from presenting evidence in recovering damages that were caused by the defendant's breach of contract without just cause, despite the fact that those damages were pleaded and or allowed by Virginia law. Turning to the first point, this court has ruled in Ashland Facilities Operations and the Supreme Court of Virginia has also ruled that unless the facts are disputed, agency, relationships, or facts to be determined by the jury. Well, let me ask you about that. I don't know who Blaine is. It's kind of like a puppet and a puppeteer. So tell me, Wasson is connected to Blaine. Yes, Your Honor. He's connected to the regional, whatever the housing department is. Yes, sir. And he's sitting at the same desk, and he's performing all the duties. Which hat is he wearing and when? Your Honor, Mr. Wasson was asked that question in his deposition, and he testified that while he was administrating Carnell's contract, and I can tell you this is on Volume 5 of the Joint Appendix, pages 2782 through 83, he was asked that question about transferring this contract from DRHA to Blaine Square, and he testified that he administered the contract along with Mr. Olding as both, as the president of the managing member, which is Danville Housing Company, that's the managing member of Blaine Square, and as executive director of DRHA. The same interrogatory was given to Blaine Square. The interrogatory asked, and I'll quote, and this is Volume 5 of the Joint Appendix, page 3002, identify all individuals from Blaine Square, LLC, who played any role in administering the contract between Blaine Square, LLC, and Carnell and or overseeing DRHA's administration of the contract between Blaine Square and Carnell, and their response was that this person, who was from Blaine Square, was Gary Wasson in his role as president of Danville Housing Company. We believe that that evidence at least provides a reason for this to go to the jury, and there's much more evidence that was before the district court. However, that court said that there was no evidence that showed that Mr. Wasson did that. There are many documents that show that Blaine Square itself was the developer of this project. In fact, in order to get the development services agreement, which seems to disclaim an agency relationship between the housing authority and Blaine Square. Yes, Your Honor, I would like to address that. As Judge Keenan wrote in Hartzell Fan, Incorporated v. Waco while she was on the Supreme Court of Virginia, looking at an agreement and what parties call themselves an agreement is not the end. In fact, it's really of no moment. The key is to determine what those parties are under law. In this case, the Virginia Supreme Court in Thaxton v. Commonwealth has listed three indicia of an agency relationship, even in light of a contract that says it's an independent contract relationship. Thaxton said there are three indicia. One, the prohibition against assigning the contract. Second, the authority to discharge. And third, a declaration of one acting on behalf of the other. In the Thaxton case, that declaration was made orally. In this case, all three of those indicia are in the development services agreement. The development services agreement, Section 8D, Volume 5, page 2498, prohibits the assignment of the contract unless the other party agrees. The authority to discharge, which the Thaxton court says demonstrates control. Whether it's used or not is not the point. It's whether or not that authority exists. And that is in Section 4 of the development services agreement, page 2495. And in the development services agreement, there's a declaration that DRHA would be acting, would supervise, on behalf of Blaine Square. And I would take that further to look at, oh, and I didn't give you a site. That's page 2494, and that was Section 1, Roman numeral 9. To go even further, if you look at Section 1, Roman numeral 8, of the development services agreement, it says that DRHA would assist Blaine Square in performing its obligations, and this is a quote, relating to any agreement in connection with the development. Assisting is not an independent contract relationship. And certainly, as the Supreme Court ruled, not all of these situations were existent in Thaxton, and Thaxton ruled as a matter of law that the Supreme Court did, that that was an agency relationship. And so we would say that the development services agreement certainly does not show that it's an independent contract relationship. Moreover, if the court were to look at the regulatory and operating agreement, Blaine Square has said in that operating agreement that they alone are solely responsible for the acts of its independent contractors, employees, and agents. So if they are alone responsible for it, this certainly really is a matter of law. They cannot be. If they are in control and responsible, it cannot be an independent contractor relationship. So you say it's master-servant? Absolutely, Your Honor. Absolutely. They've said that they're acting on behalf of, they have the right to discharge, they're assisting. In fact, in fact, under the HOPE VI doctrine, the HOPE VI regulations, Blaine Square had to develop this project. HOPE VI program was made such that a private developer would be partnered with a public housing authority, and they would come together to make the housing, the project. The HUD approval of Blaine Square and DRHA into this program mandated that Blaine Square be the developer, and that's at JA Volume 5, page 2556. To that end, in the amended and restated operating agreement of Blaine Square, Section 2.5 says that their purpose was to, among other things, develop this project. Interestingly, the trial court quoted from that section but left out the quote that said that Blaine Square was the developer. And so we believe there's abundant evidence that shows that they are the developer and could be certainly a rational, reasonable juror could find upon this, and we have much other evidence, if the court would like for me to set it forth, that shows that Blaine Square was part of the construction. If nothing else, just looking at their admissions and Mr. Wasson's statements as well as their statements to our interrogatories, we believe show that. Let's give you that. Tell me how Blaine is a discriminatory actor. Your Honor, Blaine is a discriminatory actor because they are the ones, as they explained in their assignment to Carnell. A discriminatory actor other than through agency. No, yes, Your Honor, absolutely. They are discriminatory. They were the ones who, because of, well, you say other through agency. They're the ones who are responsible for paying Carnell, and that was required by their investment agency, and that's set forth in Carnell's assignment, that they would pay Carnell. When they paid Carnell, they paid Carnell 90% of what Carnell was due. When they paid Commodore, the other general contractor, they paid Commodore 97, almost 97% of what was due. Both contracts required 5%. Both contracts, both the law, Virginia law applied to both contracts required 5%. Carnell was withheld. They withheld 10% from Carnell. They withheld only about 3% from Commodore. There are other things, prepay. With respect to prepay, that was solely a Blaine Square activity. What about the fact, and how does it factor into your analysis, that the Development Services Agreement specifically disclaims an agency relationship? Your Honor, the Supreme Court of Virginia has looked at that and said whether or not it disclaims an agency relationship is really of no moment. We want, and in fact, Your Honor, you said that yourself in Hartzell-Fann. Well, I don't remember the facts of Hartzell-Fann, I have to be honest with you, so I can't tell you exactly in what context that statement was made. But you don't think that it makes any difference whatsoever about the fact that nothing contained in this agreement shall be construed to constitute any party as the agent of another party? You're saying that we just ignore that? No, Your Honor, I'm not saying that you ignore it. What I'm saying is that you look at the entirety of the agreement and you look at the facts of this case. You look at what actually happened. So you're saying if they acted contrary to those disclaimers, that that would trump the disclaimer? Well, I'm saying two things, Your Honor. What I'm saying is that, one, if you look at the Development Services Agreement itself, it has contained within it language that shows an agency relationship as set forth by Virginia law in the Thaxton v. Commonwealth case. So if you look at the language of the contract, the Development Services Agreement itself, it's conflicting. It says it's an independent contract relationship, but when you marry that with I can fire you and you're acting on my behalf, those are agency terms. When you go beyond that to look at what really happened here and you ask the defendant who was acting in this case and they say Mr. Wasson was acting on our behalf, then those facts show that this was an agency relationship. Did Scales own that language in the proposal that was introduced against your client? I'm sorry, Your Honor. Did Scales own the language? The proposal? No, Your Honor, he did not. You're talking about the impeachment. No, Your Honor, he said I have not signed this, and that language is not in the contract. He said I did not sign this, this is not what I signed, and this is not what I did. With respect to that impeachment, the court stated four separate times this is not inconsistent statements. What Mr. Scales has said is not inconsistent with what has been said before. What was critical is what the defendants were trying to do when they said, this was the question, the content you're shaping, whether or not it's true, so long as it supports the race discrimination narrative, you would be prepared to submit it to this jury. Isn't that right? That had nothing to do with the proposal Mr. Scales did not sign and never said he signed. Now, you made a really, I think, repeated objections on the fact that it was unduly prejudicial. Yes, Your Honor. But did you ever raise the objection regarding extrinsic evidence under Rule 613? Your Honor, I don't believe that it was raised with respect to 613, that it was not, but it was not with respect to the language 613, but it specifically was raised many times this is not inconsistent. There's nothing that he has said is inconsistent. What was raised? What was raised was that the objection that the extrinsic evidence should not be admitted because Rule 613 is entitled. Did you raise the 613 objection or not? Your Honor, we did, not with the term 613. The term was this is not inconsistent. Well, the reference was made to Rule 403. I'll grant you that. Yes, Your Honor. I'm having a hard time reading through that transcript seeing how you get to 613. By saying that it was inconsistent. We've said that many, many times, Your Honor. I'm sorry. The proposal was never admitted into evidence. It only showed up on the chart at the closing argument. Your Honor, he read from it. The trial court allowed, as a matter of fact, the last time the court said this is not inconsistent because that was what trial counsel said over and over. This is not inconsistent. The court agreed four times. The last time the court said, and this is a quote, he said, it's not inconsistent, and the court said, but I'll let you ask about one and two, and that was about the proposal. So he read that into the evidence. He did not submit the document into the evidence, but he allowed it to be read into the evidence as he questioned Mr. Scales. And so the court knew it was objected to with respect to inconsistency. By that time, it had been objected to so many times, Mr. Scales said, I didn't say this, and the court says, okay, we'll let you go on and impeach him. It was not – I have looked at all of the Fourth Circuit law that I can on 613, and I have never seen a case where the court has allowed the impeachment of a witness where the statement was not inconsistent, let alone the court saying four times that it was not inconsistent. You've made certainly a clear argument in your brief and here today, but it seems different than the tact that was taken at trial for whatever reason because there's – at least I can't find it. There's no request for a mitigating instruction. The information comes up at closing, which is a separate consideration. There's no objection. There's no objection when the proposal is put up and read to the jury. There's no request for reconsideration. It makes you wonder, in the absence of those actions that counsel did not take at trial, whether the angst that you represent here was that significant. Your Honor, absolutely. If you would look at the Joint Appendix, Volume 8, Carnell objected numerous times, numerous times this was unfair, misleading, confusing, irrelevant, not probative, not inconsistent, and prejudicial. Those are in Joint Appendix 8, pages 4694, 4696 through 98. You're certainly right about that, but the other items that I listed would have seemed to be the natural thing that counsel would have done in that circumstance. Your Honor, when the question was read and the court allowed that to be read twice, what you're trying to do here, and that's what Mr. Scales was asked, what you're trying to do here is to shape a story, whether it's true or not, and give it to this jury. And all of those objections had been made, and then the court allows this to be read. The damage had been done. There was no mitigating the court. One of the objections was, Your Honor, what they're trying to do is to say that Mr. Scales is lying here, and that has nothing to do with what's being done here. And the court said, I know, and then he let the impeachment continue. That was the implication before the jury, and no limiting instruction. Well, what limiting instruction could be given? We would say there couldn't be. We're just trying to show his credibility, and that's what the court said. We're just showing his credibility. Your Honor, the court had shown thoroughly that that wasn't his intent. And so we did not ask for mistrial, and when it came up in closing argument, because the court had allowed it to be read into the case in the case in chief, it just seemed to be that that was something we were stuck with, along with a number of other decisions that occurred in this case. My time is over. I have one question. Yes, Your Honor. A different topic. With regard to the Public Procurement Act notice, the decision of the district court was based on the reasons expressed by Judge Kaiser in earlier cases, which dealt with a letter that counsel had sent after the mediation had concluded. That was not in evidence in this trial, and I'm wondering what gave notice under the Public Procurement Act of the contract claims. You're talking of the previous? You mean in this trial, Your Honor? That's the one on appeal, yes. Yes, Your Honor. The letter of protest and notification of intent to file the claim. That's at Joint Appendix Volume 8, 4264 through 265. The actual letter is at Joint Appendix Volume 15, pages 8177 through 181. That letter was sent by Mr. Skills on, I believe, the 8th of October, 2008, and that's the title of it. That was before the mediation. That was before the mediation, yes, Your Honor. Did you rely on that in the third trial? Your Honor, we didn't rely on that in the third trial, but it was certainly in evidence in the third trial. The jury had to determine whether or not Carnell had satisfied the requirements that was a jury instruction. And the court asked them. This is Joint Appendix Volume 12, pages 6631 through 632. The jury was instructed, if Carnell has not satisfied the Virginia Public Procurement Act notice requirements, you are instructed to fine for DRHA in Blaine Square. And so the police have to prove that there was insufficient evidence. The Virginia Public Procurement Act is a very strict notice requirement. Yes, Your Honor. In this particular case, since the notice from counsel that occurred after the mediation, and correct me if I'm wrong, the damages that were claimed were substantial. Yes, Your Honor. They were unpaid work. The trial court seems to have erred. You can tell us where this is incorrect, but the reasons expressed by Judge Kaiser, which are the sole reason that Judge Conrad relied on in denying the motion filed by the defendants, was in turn based solely on the post-mediation letter, which wasn't in evidence in this case. And looking at this 2008 letter, it would appear that that's limited to two distinct items, a sediment pond and a lady's property across the road. And I know there's some dispute on whether or not that was paid, but that seems to be a long way from putting the defendants on notice about the majority of the contract claims that occurred after the mediation concluded. There was a third thing, Your Honor, and the third thing was, and that was the substantial part of this case, and that was the July 11th plans that was set forth in the mediation, that was set forth, I'm sorry, in this letter of protest and notification of intent to file a claim. Your Honor, my understanding of Virginia law, once that letter was sent, there was a requirement for a letter to be sent. That letter was sent. Under Virginia law, the defendants were required to respond to that letter, and their response would dictate what would happen further, or the case could be put into mediation. The case went into mediation, and we would contend that under Virginia law, under Virginia Public Procurement Act, as well as the court's review of the Virginia Public Procurement Act, that once the letter of notification was sent, when they didn't respond and the case went into mediation, the notification requirements were met because of that and the issue is was the defendant, were the defendants aware of all of the issues that existed? They were clearly aware of it because mediation ended November 17th, I believe it's November 17th, 2009, and it was ended as unsuccessful. Thank you very much. Thank you, Your Honor. Mr. Uhrer, are you going first? Yes, Your Honor. Come on up. Unless the court, Your Honor, would prefer to hear from Mr. Pope. I represent John Uhrer. I represent Blaine Square and will be arguing only on the summary judgment issue as to Blaine Square. Mr. Pope will handle all the other arguments and the cross-error. The opposing counsel says there are questions of material fact that prohibit summary judgment as to Blaine Square, so tell us why you would disagree with that analysis. We disagree with that analysis for several reasons, Your Honor. The first has to do with the record that was before the district court on summary judgment. As it happens, Volume 5 of the Joint Appendix ends with the transcript of the hearing. So any reference to a document that is post Volume 5 of the Joint Appendix came in after the summary judgment proceedings. The issues and the evidence that were presented to the district court were drastically smaller and more confined than the issues and the evidence that have been argued to this court. We understand the law to be that an appeal is not a you don't get to have a redo with more evidence and different arguments on summary judgment. You stand on the arguments that you made to the district court and gave the court a chance to rule on. For instance, counsel, in response to Judge Floyd's question about what was the evidence that Blaine Square was discriminating, she mentioned prepays to Carnell. She mentioned retainage. Those issues were not argued to the district court. I would cite the court to the Carnell brief, which, of course, you don't put briefs in a joint appendix, but it's document 353 in the record, which sets out the evidence that Carnell relied on in the district court and the arguments it made. This is their summary judgment brief. Their summary judgment brief, and that is the issue I'm addressing. Most of Mr. Albing's actions were never argued in the district court. The actions regarding work about clearing and grubbing immediately at the beginning of Carnell's operations, the regulatory and the operating agreement, retainage, Mr. Mayo's, the DHRA, DRHA board members' issues, the payments or withholding issues, those were not argued to the district court and were not part of the summary judgment proceeding. What we would argue, number one on the agency issue, is that unless this court, we believe that issue is moot, unless this court reverses the judgment against DRHA and the only issue that would lead to that relief is the impeachment issue, which Mr. Pope will address. But we believe our whole issue becomes moot unless there is a reversal because exoneration of the alleged agent would exonerate any alleged principle. But substantively, the arguments on DRHA really hinge on whether the issue on summary judgment was as to the acts that were alleged to be discriminatory or retaliatory, did Blaine have the right to control, which is under all federal and state law that I'm aware of, including the general building contractor's case from the U.S. Supreme Court, the right to control is the key and determinative element in an agency inquiry. And there is, we believe the district court was exactly right that Blaine did not, there is no evidence to create a genuine issue of material fact that Blaine had the right to control Carnell's actions on the matters that are alleged to be discriminatory and retaliatory. The essential, there are, of course, the court has inquired about the development. The opposing counsel raises the point that notwithstanding the language of the services agreement that there are facts and evidence with respect to Mr. Wasson, if that's his name, who acted both on behalf of the Danville authority and on behalf of Blaine Square, and that it would require a jury to determine what hat he was wearing when in order to determine whether or not he acted for Blaine Square. And we disagree, Your Honor. We believe Mr. Wasson, when he acted for DRHA, wore a very large hat, a 10-gallon hat, if you will. He was the person in charge as to DRHA. When he acted for Blaine Square, he wore a very small hat. And I will refer specifically to the amended Blaine Square operating agreement. Judge Floyd asked who is Blaine Square. They are a passive entity. They are an LLC. They have members. They have no officers, no directors, no employees. They are required by the tax laws to be an entity through which tax credits are passed to private investors to bring in the money to make this sort of project work. Who is the managing member? The managing member is Danville Housing Company. And I'll refer to that amended and restating operating agreement. Danville Housing Company is given in Section 5.3 of the operating agreement, that's Joint Appendix 2449, given the broad authority that a managing member may have under Virginia law as a managing member. But the key to that is that Section 5.5, especially 5.5B, subparagraph 5, Joint Appendix 2452, takes away most of that broad authority. That section is headed restrictions on the authority of the managing member. It says there is no blanket authority. The managing member has no blanket authority. It needs the approval of the special member and the authority and lenders where appropriate to do a number of things, specifically including terminating, amending, or materially modifying any project document. Project document is a defined term at JA2433. It includes the development services agreement. So the managing member and Mr. Wasson, in his small hat, had no authority to modify or terminate the development services agreement, which is the direct... Didn't Wasson sign documents as Blaine's president? By mistake, Your Honor. But those are not discriminatory acts. There are three instances in which there is confusion. Well, I mean, he signed it multiple times as president. In one occasion, two documents in 2007 when Blaine Square was just a shell. It had only Danville Housing Company as its member. He signed the application to the Virginia Housing Development Authority to get the tax credits, and he did sign as Blaine Square's president. He was not, in fact. Blaine Square was then and remained an LLC with no officers. So that is an error, and he signed the form that went with that cover letter in 2007 before there's any question of discriminatory, retaliatory acts. In 2008, he sent in a required certification. There was a time limit. They had to spend 10% of the funds that were going into this project by a date certain or they lost the tax credits. He pulled from somewhere a piece of letterhead that said at the top that Gary Wasson was president of Blaine Square. He signed that letter as president of the managing member. So the only signatures that I know of in the record are those 2007 ones, which had nothing to do with Carnell, nothing to do with discrimination or retaliation. It was just a mistake, and I think the documents were kind of moving around fast, and there was a lack of care with that. But that doesn't make him the president, Your Honor. He is the president of the managing member, Danville Housing Company. On his authority, though, Your Honor, that 5.5 of the agreement says he cannot terminate DSA. I beg your pardon, Your Honor. Thank you very much. Are you or Mr. Polk, who would be the one that would receive a question about the Procurement Act notice? Mr. Polk. Okay. Come on up, Mr. Polk. Mr. Polk, Ms. Harmon says that the letter from 2008 is sufficient notice under the Procurement Act. Why would she be incorrect? I think it's for the various reasons that you had stated, Your Honor, that the— Just ask a question. Sure. If I may restate your answer to that, Your Honor. The statement, the letter was provided on October the 9th, 2008, and it related to two very discreet issues. It related to DRHA's directing Carnell to clean out Sediment Pond No. 3 and remove siltation material from another property. And these grievances—and I think what she stated was that, well, there was no response to this letter. Well, Your Honor, that's not correct. These grievances were actually—the response was that the issue was resolved by change orders, and those change orders were issued on October 23, 2008, and they were found in the Supplemental Joint Appendix at 15 through 20. And Mr. Scales admitted at trial that Carnell had experienced no issues regarding payment prior to December 10, 2008. So the point is that there was absolutely no proof before the jury to establish that Carnell had established the very strict written notice requirement under the Virginia Public Procurement Act. The invoice— That would go to additions to the contract through change order, not any funds that were owed under the original contract price that may not have been paid. Correct. That would be the extra work claims that were—and those were—the extra work claims were provided in 25 invoices that were actually sent to DRHA on July the 9th, 2009. This was almost 7 or 8 months after the October 8th letter had been provided, and they were—that's what the extra work claims related to were those invoices sent many months later. And the Virginia Court of Appeals in Commonwealth v. AMIC found that the notice requirement is not merely a heads-up about an ongoing issue, which I believe that Carnell is somehow attempting to state that, well, there was some language in this October 8th letter that provided this open-ended grievance, but that does not satisfy the Virginia Public Procurement Act, which is to be strictly construed and the contractor has a strict duty to provide notice of a specific claim and to provide the details regarding that claim. And so based on that, Your Honor, the Carnell on the contract claim, they're entitled to an award of $12,000 for their—the profit for overhead and for return of retainage. So the reward that they would be entitled to would be approximately $72,490. They're entitled to that. The jury correctly awarded them that. There is evidence to establish that and to sustain that verdict, and we're not challenging that part, but they are entitled to that and no more. Now, Your Honor, if I may quickly address the impeachment issue. The court is correct. There was no objection made pursuant to Rule 613. Well, they didn't have to. They raised the issue of unfair prejudice in Rule 403, and why in the world is it not unfairly prejudicial? It's just of such concern when you have a race discrimination claim and then you have Mr. Scales being stuck with a document that he didn't sign, being—suggesting that he shaped the story. In other words, that he's playing fast and loose. His intent is to play fast and loose, to be sympathetic to Carnell and critical of DHRA, that he can't be believed. Now, why isn't that unfairly prejudicial to Mr. Scales when he didn't sign it? Your Honor, specifically, they never objected saying that he didn't sign that. There was no objection. There was no evidence that he didn't sign it. He made that. There's no evidence that he signed this document. He stated that I never signed it. Exactly. But there is evidence that the documents itself, when they were provided, this was a comprehensive contract. It doesn't matter. The proposal itself— How do you know that he even saw it? Well, Your Honor, that was an issue. That's a fact question. And, Your Honor, he stated he'd never— The court didn't make a factual finding that he saw it. But, Your Honor, he ratified knowledge of that. If you look at the first trial in which Judge Kaiser looked at this evidence, and this is a point. I know that Carnell's brief is very critical of Judge Conrad's finding, changing course on the eliminate issue. But Judge Kaiser did the exact same thing in the first trial. Well, that's not necessarily a strong point, is it? Don't you have to address the merits rather than the outcome? In other words, why was it done? Why was it changed? Why was it changed? Judge Kaiser changed it because there was contradictions. He found there were contradictions in the evidence, and he was very careful with how the evidence was allowed in. It was allowed in to state that Carnell had hired a consulting firm for purposes— This is the first trial you're talking about. Why are you talking about that now? This applied to both trials. Okay. Why aren't we talking about the third trial? Yes, Your Honor. The third trial, Judge Conrad allowed it in for purposes of stating that Carnell had engaged the consulting firm, where I was consulting, for purposes of shaping a story in the media. He excised—he was very clear to excise all of the information from that proposal that related to engagement of the NAACP. Right, but I've got it all highlighted, what the judge allowed in, and he allowed in the shaping of the initial story so that it's sympathetic to Carnell and critical of DHRA. In other words, he's trying to shade—they're going to try to shade the facts. They're going to try to shade the story so that the outcome is sympathetic to Carnell and critical of DHRA and expand the story in Danville to garner broader interest in the case in neighboring counties and potentially statewide interest. They're trying to make this into a theater, a forum. Why isn't that unduly prejudicial? He was attempting to do that in the context of the media surrounding this dispute. He did not allow it in, and I do not believe that is prejudicial, Your Honor. Why? I believe that goes— Why did you want to get it in so badly, then, if you didn't think it was prejudicial? Obviously, it's prejudicial. The question is, was it unduly prejudicial under the rule? Yes, Your Honor, exactly. It was not unduly prejudicial. Rule 403 tilts in favor of admission. This showed that on one occasion that Carnell, Mr. Scales, was indifferent to the truth. He did not—and that was actually read into the evidence testimony from the first trial. It was read that the Shape the Story narrative had been used for purposes of shaping the story, and that he affirmed and ratified that use then. Then on that occasion, that— I'm losing you, though. Are you talking about the third trial now or the first trial? In the third trial, they read excerpts from the first trial. Okay. In the first trial— Now, who is they? DRHA read in excerpts of the— In questioning Mr. Scales. In questioning Mr. Scales in the third trial. And in that, Mr. Scales stated that he was indifferent. He did not care whether McGuire Woods Consulting shaped the story. That was his testimony. And in his testimony in the third trial, he stated that he never intended or wished that McGuire Woods would— McGuire Woods Consulting would shape the story in this media campaign. Well, you downplayed in your brief this proposal language, not a big deal. If it wasn't a big deal, why did you put it on a poster board in front of a jury in closing argument? Well, Your Honor, I think it was a big deal in the sense that it showed Mr. Scales' lack of veracity in general. Why doesn't that go to the core of the case? That's the heart of the case. Well, Your Honor, it was—his veracity was—it was a large part of the case.  But the—it was relevant to show and the plaintiff and the defendants had the right to demonstrate that he had made inconsistent statements in the past. That is a—that's actually a right that the defendants absolutely had. What about the use of the proposal? The proposal— That's not an inconsistent statement of his. Your Honor— That's Mr.—what was his name—Hubbard? Mr. Hubbard's statement. A statement of a contract of an—Aguirre-Woods was an agent that was—they were working in an agent-principal relationship, a proposal that was provided in a contract that he signed. I think he— We don't know that he ever—the evidence doesn't show that he ever saw that. You're just saying if he was a good—if he was a careful person, he would have read every page of a contract. But he's never read every page of a contract. Well, in the— When they're represented— On the third trial, he testified that he knew of the Shape the Story language. He had that email that he had— Sure, by that time, he would, wouldn't he? Right. But he had admitted that was testimony that he had proffered in the first trial. He knew about the Shape the Story language. He knew about that. That was in—I believe that that—there was some evidence of that. And in any event, in the alternative, if there was any error, that error was harmless. How did he ever ratify that he—but it wasn't his statement. How did he ever ratify at any time that he had read the proposal? He had never stated that in the third trial, Your Honor. Right. But they never objected on that grounds. They objected that it was unduly prejudicial. Right. But they never objected saying that it was not his statement. But it wasn't his prior testimony. It wasn't the prior testimony that was put on the poster board. It was the proposal language. Right. It was the proposal language. And the basic content of that, of the proposal language, was similar to the content that had been allowed in the first trial, which was the—we are— McGuire Woods Consulting made a statement in an email stating that we have placed this— we have placed a story in a Danville newspaper, and we really shaped the story on that issue. So he knew of this media campaign, and he knew of what was happening regarding that. And in any event, if there was any error, which I do not believe there was, any error was harmless. And I'll reserve the rest of my time. Thank you, Your Honor. Thank you, Mr. Pope. Ms. Harmon, you have some rebuttal time. Ms. Harmon, I don't want to distract you from this. Yes, Your Honor. But if we were going to send this back, on what grounds would we send it back? Because the proposal was never admitted into evidence, correct? Your Honor, it was read into evidence. It was not sent back—it was not presented into evidence as a document, but it was read into evidence. Well, does—OK. Does 613 apply if the document wasn't offered into evidence? 613 is the impeachment—deals with the impeachment. So absolutely, Your Honor, because that document read into evidence really in a sense could be more harmful than it being placed into evidence in the documentary form because the jury heard it. And not only did the jury hear it, the jury heard the question twice, that essentially what you're trying to do is lie to this jury, which none of those questions, with respect to the proposal, had anything to do with what Mr. Scales was doing in front of the jury on that date. What's critical as well is that they're saying that Mr. Scales was aware of the shape of story information. Mr. Scales stated, both in the first trial and the second trial, and I quote from the third trial, the third trial, he says, I'm getting confused on this shaping the story. He didn't know what they were talking about. He says, the answers I've provided them—I have answered that I provided them with the information. He's talking about the media people. He was just trying to get his story out. That's what he explained. We're not a PR, folks. We don't have cards. We just wanted to counter the negative information that was coming out, and we gave them pictures and the history of our story and how they presented that story. He says, I move dirt. I don't do media stuff. So how they presented my story, no, I don't care how they do that because I don't know how they do that. I just know how to do what I do. As far as the shaping the story proposal information, he said, I don't even know what you're talking about. I didn't sign that. I'm not familiar with that. I don't know what you're talking about. That was unduly prejudicial because the question, again, asked was, are you trying to spin facts in front of this jury? Another critical thing with respect to that, Your Honor, is that the court asked, Judge Conrad asked, is there any information that they did any of this, that they did anything to improperly influence this jury? And the defendants answered, no, we don't have any information about this. This is just about his credibility. And to impeach him with a document he never signed that was never inconsistent with anything he said, but under the guise of this is credibility, and Mr. Scales said, I don't see anything that I've said inconsistent. The court said, well, we'll let the jury decide that. What is your appendix reference to your representation that he said he didn't know anything about the proposal? I'm sorry. Do you have that handy just because it's a big record? Yes, Your Honor, I just have that. Oh, did you just give us the number? I didn't give you the number. I read from it but didn't give it to you. Your Honor, it's Joint Appendix 8, page 4715. It says, I'm getting confused on the shaping the story. Okay, thank you. That's what he said there. And then he tried to explain what he was trying to, what the proposal was about. I'd like to turn, unless there are other questions about that, with respect to Blaine Square. There is evidence before, there was evidence before the trial court, excuse me, about Blaine Square's independent actions of race discrimination. The prepay, counsel said that wasn't before the court. The prepay document at Joint Appendix 5, page 2614, deals only with Blaine Square. It's entitled Blaine Square, and that was the document that gave almost half a million dollars to Commodore while giving Carnell. Was that an argument you made to the trial court? Your Honor, prepay was absolutely before the trial court, and the court talked about prepay. Was it before the trial court at the summary judgment? At summary judgment it was. This document was before the court at summary judgment. Joint Appendix 5, 2614, that's the summary judgment evidence that was before the trial court. You argued that. Your Honor, I wasn't there then. Do you know if that was argued to the trial court? I do not know whether prepay was argued before the trial court. I do know that what was argued before the trial court was that, excuse me, I know that prepay was argued before the trial court for summary judgment. I know that the document with respect to prepay was presented to the court for summary judgment, and that document says Blaine Square. I don't know whether the trial counsel said that this argued that this is only Blaine Square. The document that said that it was only Blaine Square was before the trial court, and prepay was before trial court. So those two were there.  Your Honor, can you represent that either in the briefing or at the actual argument before the trial court on this issue that those two items, the prepay and whatever the other one was, that those were argued as a basis for Blaine Square's liability? No, Your Honor, I'm not representing that. I don't know that. What I do know is one thing that was presented to the court, and something I didn't bring up earlier, that Carnell was defaulted. Mr. Wasson testified, and this was presented to the court. Carnell was defaulted to protect Blaine Square, and that is Mr. Wasson's statement with respect to that is Joint Appendix 5, page 2608. That was solely for Blaine Square's purposes. Mr. Wasson's testimony that he represented Blaine Square was before the court, and that was discussed with the court. The defendant's statement in their interrogatories that Mr. Wasson administered this contract on behalf of Blaine Square as the president of the managing member of Blaine Square, that was before the court. Now, with respect to Mr. Wasson signing documents and having limited authority, if the court, before the court was the amended and restated operating agreement, in page 2449, 5.3a, something that this is the document that opposing counsel read from, it says the managing member shall have sole right to act in the name and on behalf of the managing member, and it says that he has the authority, he is fully authorized to take any action of any type and to do anything and everything which a managing member of a limited liability company may do. Now, Mr. Wasson signed many documents. Okay, Ms. Harmon, I'm sorry. I didn't mean to interrupt you. I thought you were at a stop there. If we were to agree with you that that impeachment material was unduly prejudicial, does the case go back just on the race claim? Your Honor, if that were the only thing the court were to agree on, then it would go back on the race and retaliation claim. You're saying it wouldn't go back on the contract claim as well? We believe . . . well, not with . . . if you only agreed with respect to impeachment, we believe, and I haven't talked about the contract claim. The contract claim should not go . . . No, my question is, before you take off . . . Sorry. No, it's just that I want to make sure I've got this straight as to the relief you're seeking. Yes, Your Honor. If we agree with you that the evidence that the impeachment was unduly prejudicial under Rule 403 is preserved by counsel at trial, what do you get? Your Honor, what we would get would be retrial on Section 1981 in Title VI in its entirety. Okay, and not on the contract claim? Not the contract claim. The contract claim only deals with damages, Your Honor, and we believe that we're entitled to damages. Certainly, the VPPA should not apply to Blaine Square with respect to damages. They don't argue to the contrary, and the VPPA does not say that it applies to private actors. And the court did give the condition preceding charge to the jury, which bottled out that if you find Carnell did not satisfy this condition preceding it with respect to the claim for extra work, you must find in favor of DRHA and Blaine on this claim. Yes, Your Honor. Yes, Judge Floyd, that was at Joint Appendix 12, page 6631 through 632. My time has expired. Thank you very much. Thank you, Your Honor. And your rebuttal goes to what, Mr. Pope? Well, I believe that I probably should use the time to discuss the impeachment issue since it seems to be a matter of concern for the court. I guess my question is why do you get rebuttal if you're the applee? How did this . . . Is there a cross appeal here? There is a cross appeal. I can briefly discuss the cross appeal question. That would be the subject of this rebuttal. Well, that was the Virginia Public Procurement Act, the notice issue, and I think that the court recognized that the letter that was provided, the sole evidence that was provided into evidence came before the mediation and so did not arguably have fulfilled the VPPA notice. As to the other issue, the Section 1981 claims as to whether there would actually be standing, upon which Carnell could argue that there is standing. The position there, our position is that a . . . consistent with the Supreme Court's admonition in the village of Arlington Heights v. Metropolitan Housing, that a corporation does not have the attributes of race that would give rise to a claim under Section 1981. This court has not squarely addressed that question. Now, in honest and full disclosure, the Third Circuit in Conestoga Wood Specialties found that a corporation did not have standing to assert a claim under the First Amendment's Free Exercise Clause and the Religious Freedom Restoration Act, but that question has been certified to the United States Supreme Court for resolution. So that also remains an open claim, and there would be a . . . the RFRA . . . Thank you. I think your time has expired, Mr. Pope. All right. Thank you, sir. Thank you. We'll come down to Greek Council and then we're going to take a very brief recess.
judges: G. Steven Agee, Barbara Milano Keenan, Henry F. Floyd